## Case No. 15,126.

### UNITED STATES v. FOLSOM.

[Hoff. Dec. 44.]

District Court, N. D. California. June 25, 1862.

Mexican Land Grant—Conclusiveness of Location.

[Where the decree of the board of commissioners, of the district court, or of the supreme court, locating a grant, is specific and plain, and it has long been accepted as finally and definitely locating the land, and large interests have been acquired on the faith of this finality, the location ought not to be disturbed, except in the case of manifest error, and on clear proof of the incorrectness of the location, and not on the mere ground that, if the question were new, the court might have located the land differently.]

HOFFMAN, District Judge. The official survey in this case having been brought into court under the provisions of the act of 1860, the cause was argued, and a decision rendered setting aside the survey, and ordering a new one to be made, as directed in the opinion. An application for a rehearing was thereupon made in behalf of the claimants and interveners, and the cause has been reargued and submitted. The survey for which the claimants contend is that made by John C. Hays, former surveyor general, in 1857. There can be no doubt that, if this survey be disturbed, the case would be one of singular hardship. It appears that, when the cause was pending before this court on appeal from the board of land commissioners, it was strenuously objected, on the part of the United States and of some other parties who have since intervened in this proceeding, that the decree of the board was erroneous, inasmuch as it required the survey to be made substantially as in the Hays survey, and so as to include Negro Bar and the town of Folsom. On this and other questions elaborate arguments were heard, and on the 23d of February, 1857, an opinion was delivered in this court [Case No. 15,127] declaring the claim to be valid, and directing a decree of confirmation to be entered for the land as described in the grant and delineated on the diseño. Whether the particular description of the land contained in the decree of the board was or was not in conformity with the calls of the grant and diseño, does not appear to have been discussed, or intended

to be decided in the opinion referred to. No decree was entered pursuant to this opinion, but, on the 29th of April, 1857, a stipulation was made by the district attorney, pursuant to the instructions of the attorney general, by which it was agreed that the appeal should be dismissed, and that the claimants should have leave to proceed "under the decree of the board of land commissioners as under final decree." A consent order to this effect was accordingly entered, and a survey pursuant to that decree was made by John C. Hays, the then surveyor general. The correctness of this survey appears to have been acquiesced in by the United States from May, 1857, until September, 1858, when an opinion adverse to it was delivered by the secretary of the interior, in whom the right of final decision in such matters was then supposed to reside. In the meantime, lands outside of the survey, and which it is now sought to include within the grant, had been advertised and sold as public lands. The interveners, also, who had resisted the affirmance of the decree of the board, acquiesced in its finality, and large purchases were made, at a very heavy outlay, of portions of the tract included within the Hays survey, but which, up to the time of the final confirmation of the decree of the board, it had been contended should not be included. On the faith of the finality of this decree, the probate court having jurisdiction of the estate of the late Joseph L. Folsom ordered a sale of the land within the boundaries as described in the decree, and the supreme court of this state has in several suits sustained ejectments brought by persons, claiming under the grant, for lands embraced within the boundaries therein set forth. On the various sales effected by the executors of [J. L.] Folsom, his estate has received large sums of money; but, if the location be now altered so as to exclude the lands sold by them, the purchasers will be without title, while the estate will acquire a large body of land the title to which has always been disclaimed, and which has, to a considerable extent, been settled upon as public land. It is proper to observe that the executors have no wish to disturb the location as fixed by the Hays survey, the correctness of which they have so emphatically affirmed by their acts.

In the opinion recently delivered by this court, it was not assumed that the jurisdiction conferred by the act of 1860 enabled the court to set aside or correct a location definitely made by the final decree either of the board, of this court, or of the supreme court, in cases where such decrees declared and established boundaries. But it was held to be clearly within its power to construe and interpret such decrees, and that the petition, the diseño, the grant, and other documentary evidence of title on which the decree was founded, and to which

it refers for greater certainty, were properly to be considered in ascertaining the true intent and meaning of the decree. If, therefore, the decree described a particular tract, but the petition, diseño, and grant, referred to in the decree, indicated a different tract, a repugnancy on the face of the decree would arise, which would give to the court the right to carry into effect the presumed intention of the decree by conforming to the title, and correcting the error in the description. [Case No. 15,125.] On referring to the petition, diseño, and grant, it appeared to the court that the intention of the governor to grant a tract four leagues long by two wide, on the American river, was manifest, and that the board directed the eastern line to be run due north and south, on the supposition that, as indicated on the diseño, the course of the river was from east to west, and that a line drawn north and south would be perpendicular to its general course. It is urged, however, that the board were in fact aware that the general course of the river was from northeast to southwest, and not from east to west, notwithstanding that the latter was stated by Mr. Bidwell to be its general course. If this be so, so much of the reasoning in the opinion of this court as proceeds upon the hypothesis that the board intended to make the east and west lines perpendicular to the general course of the river, and described as running north and south, because they supposed the river to run from east to west, must fail. But the question recurs whether, in thus locating the grant, the board have designated a tract different from that described in the title papers. It must be presumed that they intended to confirm to the claimants the tract granted, and none other. If, therefore, on referring to the title papers, we find the land granted to be different from that described in the decree, the title papers must control, especially as they are in terms referred to and made a part of the decree itself. And this repugnancy or inconsistency in the decree would authorize this court, in the exercise of the duty of construing it, to follow that part of it which refers to the title papers, rather than that part which defines the boundaries. But it is evident that the court, if confined to the mere right of construing the decree, could disregard the specific boundaries mention in it only where a plain and unmistakable repugnance existed between the description in the title papers and that embodied in the decree. That the board and the courts had, under the act of 1851, jurisdiction to determine "all questions as to extent, quantity, location, and boundary," has been expressly decided by the supreme court. [U. S. v. Fossatt] 21 How. [62 U. S.] 449. When, therefore, such questions have arisen and been determined, and the decree has become final and conclusive on all parties, this court cannot, under the power of construing the decree, waive it, on the ground that, in its judgment, the land might have been more correctly located. The repugnance between the decree and the title papers must be plain and irreconcilable before this court, if empowered only to construe, could be justified in disregarding the specific description by which the board have located the land. Even if, as is contended, the act of 1860 gave to the court jurisdiction to determine all questions as to location and boundary, and to disregard all determinations of those questions made in former decrees, either of the board, of this court, or of the supreme court, it is clear that, where those decrees are specific and plain, where they have long been accepted as finally and definitely locating the land, and where large interests have been acquired on the faith of this finality, the location ought not to be disturbed, except in cases of manifest error. and on clear proofs of the incorrectness of the location, and not on the mere ground that, if the question were new, this court might have located the land differently. I proceed to inquire, therefore, whether, in the location made by the board, there is such manifest error and clear repugnance to the description of the land as contained in the title papers as to make it the duty of the court to direct a different location to be made.

It has already been stated that it appeared to this court to have been manifestly the intention to grant a tract along the American river two leagues wide by four leagues long. It is objected that there is nothing in the petition, diseño, or grant to warrant this conclusion. The petition describes the land as bounded by the land of Señor Sutter, as explained in the map. "The place is situated on the bank of the American river, and consists of four leagues in length to the east and two leagues in breadth to the south." Both the decree of concession and the grant describe the land as situated on the banks of the river "called that of the Americans," but the only boundaries mentioned in the grant are the lands of Sutter and the low hills to the east. The diseño, according to the scale, represents a tract four leagues in extent from west to east and two leagues from north to south. As the diseño and the grant show that the land lay on the bank of the American river, and as the petition showed that it was to be four leagues in length to the east and two leagues in breadth to the south, it appeared to the court fair to conclude that the tract was to be four leagues along the river by two in width, especially as of the diseño the river was represented as running from east to west. When, however, it was found that the course of the river was from northeast to southwest it seemed to me reasonable to give to the tract an extension of four leagues in a direction parallel with the general course of the stream, and not in a due easterly direction. It is true that the

description in the petition makes the tract extend "four leagues to the east" (por el este); but, as before observed, that direction appears to have been mentioned from its supposed conformity with the course of the river, and not because it was intended to fix the extent of the track by running a line in a course precisely east. The loose and confused ideas of the former possessors of this country with regards to the points of the compass, are well known, and the diseño. before us shows how erroneous was the notion of the petitioner as to the course of the American river. When, therefore, he asked for a tract "upon the banks of the river, consisting of four leagues in length, towards the east, and two in breadth towards the south," and delineated it on a diseño whereon he represented the river as flowing from east to west, the inference seems almost irresistible that he intended to ask for a tract of those dimensions along the river, and running "towards the east," but in a direction parallel to its course. Such seems to have been the opinion of the board in framing the very decree the correctness of which is so earnestly defended. By that decree the eastern boundary is not required to be ·drawn through a point four leagues distant in a due east direction from the westerly point of commencement. On the contrary, the southerly or back boundary is required to be ascertained by drawing "lines· easterly in a direction parallel to the general direction of the American river, and at the distance, as near as may be, of two leagues therefrom, four leagues, or so far as may be necessary to inclose eight leagues," etc. It will be perceived that neither the direction nor the length of this boundary is determined on the principle now contended for by the claimants. For it is required to be composed of lines drawn parallel to the course of the river, which the board seem to have thought would run "easterly," and its length was not to be four leagues at all events, but such as would include eight leagues within the tract. As the American river formed the northern boundary, and lines parallel to it at the distance of two leagues joined the southern boundary, which was to be four leagues in length, or so far as might be necessary to inclose eight leagues, I cannot perceive how it can be doubted that the board, like this court, considered the tract as extending four leagues in length along the river by two in breadth.

But the real question in the case is whether the eastern and western boundary lines should be run in a due north and south direction, or perpendicularly to the general course of the river. In the opinion heretofore delivered, the latter mode was held to be the more correct; and on the following considerations: (1) As the tract was to be situated on the bank of the river, and to extend four leagues in a direction parallel to its general course, it seemed that the side lines, if drawn perpendicular to the course of the river, would best preserve the rectangular shape which the diseño appeared to indicate, and would satisfy the terms of the petition, which described it as four leagues in length by two in width. (2) By running the eastern line in a due north and south direction, a long tongue of land would be included, which, it was supposed, was not represented on the shaded portion of the diseño, and which gave to the land a river front of about six leagues, without computing the abrupt bends in the stream.

In reply, it is suggested that the location of the western line has never been disputed; that it commences at a marked oak tree on the Sacramento, and runs due south two leagues; that the court has felt compelled to adopt this line, and in that respect to depart from its own theory of location; and that, if the western line be run north and south, the eastern line should be parallel to it. (2) That, on the original diseño produced from the archives, the tongue of land referred to is represented, and the course of the river delineated from a point beyond the eastern limits of the Hays survey. (3) That the only boundaries called for in the grant are the lands of Sutter and the lomerias towards the east, and the Hays survey is within those limits. (4) That the grantee ·always claimed the lands as high up the river as the Hays survey extends, and that his first settlement was made at or near Negro Bar. which, under the opinion of the court, would be excluded. (5) That, by the Mexican ordinances, the measurements were required to be made from north to south and from east to west, and where the grant is made on the seashore. or on the banks of a river or large lake, such shore was to form the ·boundary on one side, from whence the measurements shall commence. Ordenanzas de Tierra y Agua, arts. 5, 6, 8. (6) That the land included in the Hays survey is wholly within the boundaries mentioned in the grant, viz. the banks of the river, the lands of Sutter, and the lomerias; and that the claimant has the right of electing the location within those limits. (7) That the grantee in his lifetime, and his representatives since his death, have in the most emphatic manner made their election; that the location directed by the court would give to the claimants six thousand acres of land which they have never claimed, and do not now claim, and would take an equal amount from parties who have purchased since the decree of the board became final,—lands for which they have paid a very large sum, which are worth several hundred thousand dollars, and on which not less than $30,000 have been paid for taxes within the last five years. (8) That even if, under the act of 1860, this court has full authority to review and correct any final decree of the supreme court, of this court, or of the board, so far as the same relates to boundary and location, yet

it ought not to disturb such decrees where important interests have been acquired on the faith of their finality, except in cases of clear error or oversight, arising from the want of sufficient information as to the natural features of the country, and not merely on a difference of opinion, in a doubtful case, as to the most correct mode of locating the land. (9) That the final decrees of either of the tribunals mentioned, when they determine questions of location, boundary, and extent, are made in the exercise of jurisdiction decided by the supreme court to have been conferred on them by the act of 1851, and they are therefore conclusive on the United States and the claimants, especially where, as in this case, they have been accepted and made final by consent; and that, though this court, in interpreting them, may be required to be governed rather by the title papers than by the description of the land embodied in the decrees, yet it is not authorized to disregard such description, when plain and positive, unless where it is clearly repugnant to, and irreconcilable with, the terms of the grant and other documentary evidence of title, which is not this case.

I am much impressed with the force of these suggestions. I still think that, if the question were a new one, the more correct location would be to measure a tract four leagues in length, in a direction parallel to the general course of the river, and bounded on the east and west by lines perpendicular to it; or, if the western boundary along the land of Sutter be considered as established by the long recognition of it, then the tract might be measured four leagues in length in a direction parallel to the course of the river and the easterly line run to the river for quantity. Notwithstanding all that has been urged to the contrary, it is plain that, when the board directed the southern boundary to be run "easterly" by lines parallel with the general direction of the river, and thence northerly to the river, they supposed the course of the river to be nearly "easterly," and that the last line would be at, or nearly at, right angles to it. Nor could they have anticipated that a due north line would include within the tract the long tongue of land referred to, and increase so largely the frontage on the river. But it cannot be said that the survey, as made under the decree, is repugnant to, or inconsistent with, the terms of the grant. It is within the exterior boundaries mentioned in the title papers, viz. "the banks of the river," the "lands of Sutter," and the "lomerias"; and though its shape, and especially the extent of front along the river, render it liable to grave objections, yet, under all the circumstances, I have come to the conclusion that I ought not to disturb it. The survey as made by Mr. Hays is admitted to be substantially in conformity with the decree of the board. By modifying it in some comparatively unim-

portant particulars, it would be in precise accordance with the decree. That decree has been admitted by the United States to be correct. It has been accepted as finally determining the location and boundaries of the land. Large sums have been paid, and immense interests acquired on the faith of its finality, and in some instances by parties who only bought after exhausting all legal means to procure a correction of its alleged errors. It has been treated by the supreme court of this state, in several suits, as finally determining the boundaries and location of the tract. The representatives of the grantee have received large sums for lands which the proposed change in location would exclude; while the government of the United States has advertised and sold, as public land, lands which the same change would include in the grant.

After much consideration it has appeared to me that, under all the circumstances, it is my duty to approve the survey substantially as made by Hays under the decree, notwithstanding my conviction that, if the question were new, that survey is not such as this court would have directed to be made.